Sealed

FILED by _____ D.C.

SEP 25 2018

STEVEN M. LARIMORE
CLERK U S DIST CT.
S. D. of FLA. – MIAMI

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

18 62281

CIV - ALTONAGA

MAGISTRATE JUDGE
SELTZER

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF FLORIDA *ex rel.* CAMILLE AGUILAR and ROBERTA VAN DONGE, | Case No. _____ |
| | <u>JURY TRIAL DEMANDED</u> |
| Plaintiffs, | |
| vs. | **COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729,** *et seq.* |
| AMERICAN HEALTH ASSOCIATES, INC., AMERATHON LLC | |
| Defendants. | <u>**UNDER SEAL**</u> **Pursuant to 31 U.S.C. § 3730(b)(2)** |

## COMPLAINT

Plaintiffs and *qui tam* relators, Roberta Van Donge and Camille Aguilar, on behalf of the United States of America bring this action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (hereafter the "FCA") and the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081, *et seq.* (hereafter the "Florida FCA") against American Health Associates, Inc. ("AHA") and Amerathon LLC (collectively "Defendants"). Relators' allegations are based upon their own direct and independent knowledge. Relators allege as follows:

## NATURE OF THE CASE

1.      Relators witnessed Defendants engage in two types of fraud. First, Defendants fraudulently: (1) double-billed Medicare for laboratory tests which they accomplished (and obscured) by adding an improper modifier to patient claims; and (2) billed Medicare for non-reimbursable laboratory tests by fabricating patient diagnoses using a "Cheat Sheet."

2.      Second, Defendant AHA paid kickbacks to physicians who generated a certain amount of Medicare claims for Defendants by billing these physicians only for tests performed on patients who received Medicare benefits, and often billing, but not seeking to collect, for their patients who had private insurance. This kickback scheme not only generated a large volume of Medicare billing for AHA, it also kept the amount of accounts receivable inflated, which assisted AHA in securing financing from financial institutions.

3.      As detailed below, Defendants knowingly engaged in this conduct and intentionally violated, and continue to violate, the rules and regulations governing the provision of lab testing services covered by Medicare and Medicaid, and the federal Anti-Kickback Statute by providing remuneration in exchange for generating Medicare claims for Defendants.

4.      As a result of their unlawful conduct, Defendants not only violated the conditions of participation in the Medicare and Medicaid programs, but they also violated the conditions of

payment on claims submitted for lab testing services provided to patient beneficiaries, and their kickback arrangement tainted the claims submitted by Defendants for beneficiaries who were referred by the aforementioned physician groups.  Accordingly, all claims submitted to the Government resulting from Defendants' illegal conduct were in violation of the FCA and the Florida FCA.

## PARTIES

5.      Defendant American Health Associates, Inc. is a Florida corporation and a clinical reference laboratory that has been operating since 1990.  AHA's corporate headquarters are located at 15712 S.W. 41 Street, Suite 16-20, Davie, Florida 33331.[1]  AHA's client base is made up of physicians, hospitals, drug rehabilitation centers, home health agencies, community health clinics, skilled nursing homes, and assisted living facilities.

6.      In 2014, AHA acquired the long-term care division of another laboratory called "Medlab." Medlab now does business as Amerathon, LLC ("Amerathon") which is a subsidiary of AHA.  Amerathon is a Delaware corporation that was registered as a limited liability company on April 29, 2014.  Amerathon's corporate headquarters are located at 671 Ohio Pike, Suite K, Cincinnati, Ohio, 45245.

7.      At the time of the MedLab acquisition, the combined companies had a network covering 1,750 nursing facilities in 14 states, including Florida, Michigan, Ohio, Illinois, Indiana, Missouri, Tennessee, Kentucky, North Carolina, South Carolina, Virginia, Maryland, Delaware, and Georgia.

8.      Relator Roberta Van Donge resides in the state of Florida.  Ms. Van Donge has worked in the healthcare laboratory field in various capacities for over 35 years.  Ms. Van Donge

---

[1]  When Relator Aguilar started working for American Health Associates, its corporate headquarters were located at 2831 Corporate Way, Miramar, Florida 33025.

worked at AHA's headquarters, located in Davie, Florida as the Director of National Laboratory

Operations from August 14, 2014 to June 2, 2017. Ms. Van Donge was tasked with the

oversight and standardization of AHA's lab testing practices, procedures and protocols for all lab

locations. While she worked for AHA, Ms. Van Donge's daily responsibilities included:

- Ensuring lab accreditation and compliance;

- Ensuring lab inspection readiness and annual surveys for a number of states, including Maryland, Missouri, Georgia, S. Carolina, Tennessee, Florida, Ohio, Michigan, and Kentucky;

- Conducting licensed laboratory staff competency and clinical trainings for all American Health Associates locations where laboratory staff were located;

- Ensuring that AHA adhered to clinical "Best Practices" with respect to its laboratory testing;

- Upgrading clinical laboratory technology;

- Ensuring standardization of clinical processes, protocols, procedures and technology across all AHA laboratories;

- Implementing additions of services and changes on laboratory test-menus and submitting changes in accordance with Medicare's allowable CMS CPT codes; and

- Ensuring physician/customer satisfaction and overseeing lab communications on clinical matters.

9.      Relator Camille Aguilar resides in the state of Florida. Ms. Aguilar has worked in

the healthcare field in various medical billing capacities for over 12 years. Ms. Aguilar worked

at AHA headquarters, located in Davie, Florida. From July 2005 to mid 2008, Ms. Aguilar was

American Health Associates' Davie office's Night Supervisor of the laboratory. AHA promoted

Ms. Aguilar to Revenue Cycle Manager in mid-2008 and she held that title from mid-2008 to

January 3, 2017. While she worked for AHA, Ms. Aguilar's daily responsibilities included:

- Daily reviewing of AHA' Billing Error Report List for each state in which AHA did business; (see ¶ 68, infra);

- Regular contact with AHA Billing Director Diana Bernet[2] to correct staff errors, diagnosis codes, computer errors and glitches, and other various incorrect entries; contact with patients' facilities regarding correct diagnosis codes; and attempting to connect with Nursing Home Corporate Offices for payment;

- Attending weekly "department lead meetings" along with: (1) the lead employee for the nursing liaison group, (2) the lead employee who handled the billing for each of the 14 states in which Defendants did business, (3) Diana Bernet; (4) Joanna Poganat, the Head of Compliance for AHA's Billing Department[3], AHA CFO Jim Jackson and AHA owner and CEO Debbie Martin.  Topics discussed at these meetings included what personnel needed to do to get claims paid, such as following the "cheat sheet" and using Modifier 91 to get paid for multiple tests done on the same day;

- Performing all billing tasks including either correcting billing problems in a specific area, correcting billing problems in a specific State, or working on "The Exceptions Report" which consisted of mixed problems and errors in a variety of locations; and

- Reviewing patient requisitions, as well as client contact, in an attempt to ensure detailed and complete patient information was captured.

10.    The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein, and is entitled to the bulk of the recovery sought by this action. Medicare is a federal health insurance program administered by the Centers for Medicare & Medicaid Services (hereafter "CMS") for the elderly and disabled.  *See* 42 U.S.C. §§ 1395-1395hhh.  Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients.  *See* 42 U.S.C. §§ 1396-1396v.

---

[2] Ms. Bernet has been American Health Associates' employee in charge of billing for all American Health Associates regions for the past 17 years.

[3] Ms. Poganat reported directly to Debbie Martin (the President, CEO and Owner of American Health Associates) and handwrote the meeting minutes.  Ms. Poganat would then type up the meeting minutes on her computer and email them directly to American Health Associates' corporate personnel, including Debbie Martin, Jim Jackson, and Diana Bernet.

11.     The State of Florida is a real party in interest under the Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq*., and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v.

## JURISDICTION AND VENUE

12.     Relators bring this action on behalf of the United States under the *qui tam* provisions of the FCA, and the State of Florida under the Florida FCA.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730.  This Court has supplemental jurisdiction over the counts asserted under the Florida FCA, pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

14.     This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants are found, transact business, and committed violations of 31 U.S.C. § 3729 in this District.

15.     This action is not based upon the prior public disclosure of allegations or transactions in a federal or state criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal or state report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in either the FCA or the Florida FCA.

16.     To the extent there has been a public disclosure unknown to Relators, they are original sources within the meaning of 31 U.S.C. § 3730(e)(4) and Fla. Stat. Ann. § 68.087.

17.     Pursuant to 31 U.S.C. § 3730(b)(2) and Fla. Stat. Ann. § 68.083(3), along with this Complaint, Relators prepared and have served on the Attorney General of the United States, the United States Attorney for the Southern District of Florida, the Attorney General for the State of Florida, and the Chief Financial Officer for the State of Florida a written disclosure of all

material evidence and information currently in their possession. The written disclosure is supported by material evidence known to Relators at the time of filing this Complaint establishing the existence of Defendants' fraudulent conduct, which resulted in economic loss to the United States and the State of Florida. That information includes attorney-client communications and work product of Relators' attorneys, and was submitted to those federal and state officials in their capacity as potential co-counsel in this action.

## LEGAL AND REGULATORY BACKGROUND

**A.**     **The Federal and Florida False Claims Acts**

18.     The FCA, 31 U.S.C. §§ 3729-33, establishes civil penalties and treble damages liability to the United States and provides, in part, that any entity that (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties. 31 U.S.C. §§ 3729(a)(1)(A)-(B). Under the FCA, a claim includes a request for money. *Id.*, § 3729(b)(2). Further, a claim is "false or fraudulent" under the FCA if the entity submitting the claim was not entitled to payment.

19.     To show that an entity acted "knowingly" under the FCA, it must be proven that the entity, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. It is not necessary to prove that the entity had the specific intent to defraud the United States. 31 U.S.C. § 3729(b)(1).

20.     The standard of proof under the FCA is preponderance of the evidence. 31 U.S.C. § 3731(d).

21.     Under the FCA, the United States is entitled to recover three times the amount of each claim and, for each claim or overpayment, a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 for violations that occurred prior to November 2, 2015 and not less than $11,181 and not more than $22,363 for violations that occurred after November 2, 2015.

22.     The State of Florida has enacted its own False Claims Act, Fla. Stat. Ann. §§ 68.081, *et seq.*, which parallels the federal statute and entitles the state to recover three times the amount of each false claim and, for each false claim or overpayment, a civil penalty of not less than $5,500 and not more than $11,000.

**B.         Medicare**

23.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, established the federal Medicare health insurance program for the elderly and disabled.  It is the nation's largest health insurance program and generally provides coverage to individuals age 65 and over and to younger people with disabilities.  Medicare is administered by CMS.

24.     The United States provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS.  To assist in the administration of Part B of the Medicare Program, CMS contracts with Medicare administrative contractors (MACs).  42 U.S.C. § 1395u. MACs are responsible for processing the payment of Part B claims to providers on behalf of CMS. *Id.* Defendants submit claims to Medicare from Florida and Ohio.  First Coast Options, Inc. ("First Coast") is the current MAC in the jurisdiction of Florida responsible for the payment of Part B claims to Defendants on behalf of CMS.  CMS, Who are the MACs; A/B MAC Jurisdiction N (JN), https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Who-are-the-MACs-A-B-MAC-Jurisdiction-N-JN.html.  CGS Administrators LLC ("CGS") is the current MAC in the jurisdiction of Ohio responsible for the

payment of Part B claims to Defendants on behalf of CMS. *Id.*, Who are the MACs: A/B MAC Jurisdiction 15 (J15), https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Who-are-the-MACs-A-B-MAC-Jurisdiction-15-J15.html.

25.     Through Medicare Part C ("Medicare Advantage Program"), 42 C.F.R. Part 422, CMS authorizes private insurers to offer health insurance plans to individuals who are eligible for Medicare. The private insurance plans offered through the Medicare Advantage Program are paid for in full by federal and/or state government funds.

26.     The private insurers offering Medicare Advantage plans, known as managed care organizations ("MCOs"), contract with CMS to administer Part C benefits, and are required to provide the same level of service as available through traditional Medicare. All of the protections and regulations applicable to Medicare apply to the practices of the MCOs. Pursuant to those contracts, the MCOs are paid a capitated rate based on the number of Medicare beneficiaries they service and the level of sickness of those beneficiaries.

27.     Medical procedures undergone by the beneficiaries who participate in the MCOs' Medicare Advantage plans are billed to the MCOs for payment. Any and all such insurance claims paid by MCOs, as well as the MCOs' associated administrative costs, are paid using funds provided by CMS through the capitated payments.

28.     Approximately 80% of the laboratory claims Defendants submitted to Medicare were under Medicare Part B and the remaining 20% were submitted under Medicare Part C.

1.     **Medicare Requirements for Diagnostic Test Claims**

29.     Medicare does not pay for items or services that are not medically reasonable and necessary for the "diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1); *see also* 42 C.F.R. § 411.15(k)(8), (11), (12), (13), (15). In addition, the Medicare MCOs' contractual

obligations and the applicable regulations require that the MCOs have the proper system in place to ensure that they only pay for services that are determined to be medically necessary and reasonable based on objective medical criteria; that requirement also applies to entities that contract with the MCOs. *See id.*

30.     Medicare covers diagnostic x-ray, laboratory, and other diagnostic tests when ordered by the beneficiary's treating physician, consulting physician, or non-physician practitioner operating within the scope of their authority granted by the State. 42 C.F.R. § 410.32(a)-(a)(3); Medicare Claims Processing Manual ("MCPM"), Ch. 16, § 10.

31.     Doctors or non-physician practitioners who order diagnostic laboratory tests must maintain documentation of medical necessity in the beneficiary's medical record. 42 C.F.R § 410.32(d)(2)(i).  The entity submitting the claim for the diagnostic laboratory test must maintain documentation that the information that the entity submitted with the claim *accurately reflects the information it received from the ordering physician or nonphysician practitioner*. 42 C.F.R § 410.32(d)(2)(ii) (emphasis added).  The entity submitting the claim may request additional diagnostic information from the ordering physician or nonphysician practitioner to document that the services it bills are reasonable and necessary.  42 C.F.R § 410.32(d)(2)(iii).

32.     A laboratory or other provider must report on a claim for Medicare payment the diagnostic code(s) furnished by the ordering physician.  In the absence of such coding information, the laboratory or other provider may determine the appropriate diagnostic code based on the ordering physician's narrative diagnostic statement or seek diagnostic information from the ordering physician/practitioner.  *However, a laboratory or other provider may not report on a claim for Medicare payment a diagnosis code in the absence of a physician-supplied diagnostic information supporting such code.*  MCPM, Ch. 16, § 120.1.

33.    During all times relevant to this Complaint, the Medicare program reimbursed for diagnostic tests.

34.    As Medicare providers, Defendants were obligated to understand and certify their compliance with all applicable Medicare laws, regulations, and program instructions as a condition of participation in Medicare and as a condition of payment of Medicare reimbursements.

35.    Medicare providers like Defendants are reimbursed for covered services based on their submission of an electronic or hard-copy claim form called the CMS Form 1500 Health Insurance Claim Form.

36.    When submitting claims to Medicare, providers certify on CMS Form 1500, *inter alia*, that (a) the services rendered are "medically indicated and necessary for the health of the patient;" (b) ***the information on the claim form is "true, accurate and complete;"*** [4] and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws." (Emphasis added).  After a February 2012 revision to CMS Form 1500, providers further certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)."

37.    CMS Form 1500 also requires providers to acknowledge that:  "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete

---

[4] Field 21 of CMS 1500 requires that the entity submitting the claim for laboratory tests include at least one ICD-10 diagnosis code for the patient receiving the test. If this field is left blank, Medicare will not pay for the claim.

or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

**C.** **Medicaid**

38.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal government and the fifty states jointly finance the program.

39.     CMS administers Medicaid on the federal level.  The Florida Agency for Health Care Administration ("AHCA") is the state agency that administers Florida's Medicaid program.

40.     Under the Medicaid program, the state directly pays providers.  Pursuant to Medicaid Managed Care, 42 C.F.R. Part 438, Florida, like most states, is authorized by CMS to award contracts to private companies to process Medicaid claims for payment.  These private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

41.     The federal share of each state's Medicaid program varies state by state and may change each year.  Among the states, the federal share is at least 50%, and as high as over 80%. In Florida, the federal share for fiscal year 2017 was approximately 61%.  For fiscal year 2018, Florida's federal share is approximately 62%.

**2.     Medicaid Requirements for Diagnostic Test Claims**

42.     During all times relevant to this Complaint, the Florida Medicaid program reimbursed for diagnostic tests.

43.     By becoming participating Medicaid providers, Defendants, like all other such providers, agreed to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

44.     Like Medicare, Florida Medicaid does not pay for laboratory tests that are not medically necessary.  Moreover, similar to the Medicare MCOs described above, the private insurers that contract with Florida Medicaid to administer Medicaid benefits are under contractual obligations and applicable regulations that require them to have the proper system in place to ensure that they only pay for services that are determined to be medically necessary and reasonable based on objective medical criteria; that requirement also applies to entities that contract with such private insurers.  *See, e.g.,* 42 U.S.C. § 1396a(a)(30)(A); 42 C.F.R. § 411.15(k)(1).  The fact that a provider has prescribed, recommended, or approved medical or allied care, goods, or services does not, in and of itself, make such care, goods, or services medically necessary or a medical necessity or a covered service.  *Florida Medicaid Definitions Policy* 2.83 (August 2017); Florida Administrative Code 59G-1.010 (incorporating by reference *Florida Medicaid Definitions Policy*).

45.     Unless otherwise specified in Florida Medicaid coverage policies, providers must document the diagnosis and diagnostic tests and results for each service visit with a Florida Medicaid recipient.  Florida Administrative Code 59G-1.054.

46.     Florida Medicaid's Laboratory Services Coverage Policy further requires providers to "report the most current and appropriate diagnosis code to the highest level of specificity that supports medical necessity as appropriate for [the laboratory service]."  Florida Administrative Code 59G-4.190 at 8.5.

47.     These regulatory conditions and the accompanying coverage policies put Defendants on notice that these requirements are material to the Government's decision to pay the resulting claims.

**D.**        **The Anti-Kickback Statute**

48.    The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), makes it illegal for any individual or entity to knowingly and willfully solicit, receive, offer, or pay remuneration (including any kickback, bribe, or rebate) to induce or reward any individual or entity for referring or arranging any good or item or service for which payment may be made in whole or in part under a Federal health care program, which includes any State health care program such as the Florida Medicaid Program. 42 U.S.C. §§ 1320a-7b(b)(2) and 1320a-7b(f).

49.    In pertinent part, the AKS states:

(b)    Illegal remunerations

1    whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

A.  in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

B.  in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

2    whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

A.  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> B. to purchase, lease, order, or arrange for or
> recommend purchasing, leasing, or ordering any
> good, facility, service, or item for which payment
> may be made in whole or in part under a Federal
> health care program, shall be guilty of a felony and
> upon conviction thereof, shall be fined not more
> than $25,000 or imprisoned for not more than five
> years, or both.

42 U.S.C. § 1320a-7b(b).  Violation of the AKS also can subject the perpetrator to exclusion

from participation in federal health care programs as well as civil monetary penalties of $50,000

per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7(a) and 42

U.S.C. § 1320a-7a(a)(7).

50.     The AKS arose out of congressional concern that remuneration and gifts given to

those who can influence healthcare decisions would result in goods and services being provided

that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient

population.  To protect the integrity of the Medicare and Medicaid programs from these harms,

Congress enacted a prohibition against the payment of kickbacks in any form.  First enacted in

1972, Congress strengthened the AKS in 1977 and 1987 to ensure that kickbacks masquerading

as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972,

Pub. L. No. 92-603, § 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and

Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program

Protection Act of 1987, Pub. L. No. 100-93.

51.     As codified in the Patient Protection and Affordable Care Act of 2010

("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g),

"a claim that includes items or services resulting from a violation of this section constitutes a

false or fraudulent claim for purposes of [the FCA]."

52.     According to the legislative history of the PPACA, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. 810854.

53.     Compliance with the AKS, 42 U.S.C. § 1320a-7b(b), is a condition of payment under the federal health care programs.

54.     By billing physician groups who generated a certain amount of Medicare business AHA only for tests performed on patients who received Medicare benefits and by often billing, but not seeking to collect, for these physicians' private-pay patients, AHA has caused false claims to be submitted to federal health care programs.

## DEFENDANTS' FRAUDULENT CONDUCT

A.      **Defendants Double-Billed Medicare for Laboratory Tests through Fraudulent Use of Modifier 91**

55.     Defendants intentionally and systematically sought to maximize Medicare payments through unlawful billing practices, including fraudulent use of Medicare Part B Modifier 91.

56.     CMS defines Modifier 91 as used to indicate a repeat laboratory procedural service on the same day to obtain subsequent reportable test values.[5] *See* CMS, Medicare Claims Processing, https://www.cms.gov/Regulations-and-Guidance/Guidance/ Transmittals/ downloads/R2148CP.pdf.  The physician may need to indicate that a lab procedure or service was distinct or separate from other lab services performed on the same day.  This may indicate that a repeat clinical diagnostic laboratory test was distinct and separate from a lab panel or other

---

[5] Modifiers such as Modifier 91 are included on CMS Form 1500 in Field 24, subsection D.

lab services performed on the same day, and was performed to obtain subsequent reportable test values. *Id.*

57.     CMS has explained that the rationale behind Modifier 91 is to address multiple laboratory services provided to a patient on one day by the same provider that may appear to be incorrectly coded, when, in fact, the services may have been performed as reported. *Id.*  Since these circumstances cannot be easily identified, Modifier 91 was established to permit claims of such a nature to bypass correct coding edits.

58.     First Coast, the MAC that covers Florida Part B claims, explicitly states that Modifier 91 is added "only when additional test results are *medically necessary* on the same day." (Emphasis Added).  https://medicare.fcso.com/inquiries_and_denials/255391.asp.

59.     An example of the correct use of Modifier 91 is with a repeated lactate dehydrogenase test.  In this example, the laboratory runs a lactate dehydrogenase test for the patient and then repeats the same test later that same day to see whether the patient's levels increased or decreased.  A laboratory may properly add Modifier 91 to the repeated lactate dehydrogenase test in this example as follows:

- Laboratory submits Medicare claim for two Lactate Dehydrogenase (LD) tests, CPT code 83615
    - In field 24 of the CMS Form 1500, Line 1, Section A should include the CPT code 83615
    - In field 24 of the CMS Form 1500, Line 2, Section A should include the CPT code 83615 and Line 2, Section B should include "91" in the "modifier" column

In this example, the laboratory would also have to maintain proper documentation to support the medical necessity of repeating the Lactate Dehydrogenase test in order to assess whether there was a change in the patient's clinical condition.  Such proper documentation would typically be a

second physician's order for the repeated test on the same day that indicated why it was medically necessary for the laboratory to repeat the earlier test.

60.     Modifier 91 may not be used when additional tests are rerun to confirm initial results due to testing problems with specimens or equipment, or for any other reason when a normal, one-time reportable result is all that is required.

61.     Diana Bernet, AHA's Director of Billing, directed all billing personnel to add Modifier 91 to CPT codes for all cultures that were ordered for the same patient on the same day even though these cultures did not qualify for the modifier because they were not repeated tests later the same day.  Since microbiology lab cultures require 48-72 hours to have a final result, they would never be repeated later that same day and thus would never be subject to Modifier 91.  Ms. Bernet received her orders regarding Modifier 91 from Jim Jackson, AHA's CFO and Corporate General Manager.

62.     An example of Defendants' fraudulent use of Modifier 91 was with respect to blood cultures.  Each blood culture contains an aerobic and anaerobic culture (captured in two separate vials) such that each blood culture contains two vials per set.  Since each aerobe and anaerobe vial is taken as part of a single blood culture set, Defendants should have only submitted a claim for one blood culture set to Medicare for reimbursement.

63.     Instead, Defendants submitted a claim for the aerobe vial under one CPT code and a claim for the anaerobe vial under the same CPT code with the 91 modifier attached even though the anaerobe vial was taken during the same testing period[6] and was thus not a later medically necessary blood culture taken to obtain subsequent results.  *See* example in ¶ 59, *supra.*

---

[6] AHA's computer software, known as the Quality Systems Software ("QSS"), time-stamps all lab specimens upon accessioning.

64.     In general, doctors would order from Defendants two to three blood culture sets (*i.e.* two aerobe and two anaerobe vials) per patient.  Defendants' fraudulent Modifier 91 use thus enabled them to claim reimbursement for four blood cultures instead of two, or for six blood cultures instead of three.

65.     Defendants also fraudulently applied Modifier 91 to Medicare claims for multiple wound cultures by failing to properly examine the patient from whom the wound cultures were taken.  As an example, if a patient had six pressure ulcers, a nurse should collect six wound cultures.  Under these circumstances, laboratory technicians properly doing their jobs would know through their training and knowledge of organism traits that the same organism was recovered multiple times and should be billed as part of a single claim. Nevertheless, Defendants (via Diana Bernet and Jim Jackson) instructed their billers to append Modifier 91 to all wound cultures done on the same day so that Defendants could fraudulently submit multiple claims for Medicare reimbursement.

**B.      Defendants Submitted Claims to Medicare for Non-Reimbursable Tests By Fabricating Diagnoses via a "Cheat Sheet"**

66.     A condition of payment for claims submitted to Medicare for laboratory tests is the inclusion of an accurate patient diagnosis code in Field 21 of CMS Form 1500.  *See* ¶36, n.4, *supra.*  Diagnosis codes used on CMS Form 1500 must come from the patient's physician.  *See* ¶32, *supra.*  If CMS Form 1500 is missing a diagnosis code, Medicare will not pay for the claim.

67.     The Office of Inspector General of the Department of Health and Human Services ("OIG HHS") has made it clear that laboratories should not "use 'cheat sheets' the provide diagnostic information that has triggered reimbursement in the past" yet AHA did exactly that. OIG HHS, Model Compliance Plan for Clinical Laboratories, https://oig.hhs.gov/fraud/docs/complianceguidance/cpcl.html.

68.     AHA's QSS was designed to generate a "Daily Error List" for missing patient data. This Error List would identify the patient's name, the Accession Number ("ACC")[7] assigned to the patient's specimen and/or the tests the physician had ordered without submitted the require diagnosis for the claim form.

69.     When an AHA biller printed an error list from QSS, the error list would show what patient data Medicare required for reimbursement was missing.  QSS would then prompt the biller to add whatever data was missing from the patient claim—without which the claim would not be paid.  QSS itself did not specify what information to add, but simply indicated what patient data was missing.

70.     Defendants did not train their billers how to input correct patient information, enter codes, and complete required patient information to support the claim they are filing for payment.  Thus, Defendants' billers functioned as data-entry staff who followed Defendants' orders via Diana Bernet because they did not know that Defendants' data-entry methods were fraudulent. *See infra* ¶ 82.

71.     The most frequent missing data on AHA's error list was the patients' diagnosis codes.  There were two main reasons why the diagnosis codes were often missing. Half of the time, many physicians who ordered tests from AHA would not put a diagnosis on the prescription order for the text because the patients had a historical diagnosis in the patient's medical record, to which AHA did not have access.

72.     The other half of the time, the doctor *had* included the diagnosis code on the prescription order for the lab test but the untrained data-entry staff failed to look at the order and put in the diagnosis code.

---

[7] AHA assigns this number to specimens to identify the patient with the relevant lab work.

73.     If Defendants had followed proper Medicare procedures, they would have trained

their billers how to properly obtain and/or input the diagnosis codes.  At a minimum, Defendants

should have told their billers to look at the physician order to see if there was a diagnosis there

and input it as part of the initial claims processing. In the case where no diagnosis code appeared

on the physician order, Defendants' billers should have contacted the patient's referring doctor or

nursing home to obtain the proper diagnosis for the patient.  Medicare requires that accurate

patient information be submitted with the laboratory claims because, among other things,

different diagnosis codes may result in different levels of Medicare reimbursement for a

particular claim.

74.     Defendants did not instruct their billers to follow the correct protocol because it

did not want to delay payment on its claims.  Several thousand laboratory service claims in the

Florida region alone would typically be missing diagnoses and so Defendants realized that there

was no way their billers could obtain these missing diagnoses through the proper channels so that

Defendants could receive Medicare reimbursement for these claims.

75.     To avoid having to eat the cost of those laboratory service claims which were

missing diagnoses, AHA prepared a "Cheat Sheet" that instructed billers to plug in certain

diagnoses every time certain tests were run in cases where there was no diagnosis information

listed for the patient in the QSS system.

76.     Ms. Aguilar first saw AHA's "Cheat Sheet" sometime in the 2005-2006 time

period when she was serving as AHA's Night Supervisor. At the time, Ms. Aguilar often took

over the "on call" duties on the weekends, which included laboratory sample accessioning, and

data entry of laboratory results.  An AHA employee named Erin Daugherty, another on-call

weekend employee, gave Ms. Aguilar the "Cheat Sheet" in case she had to complete a patient

record and insert a missing diagnosis while "on call" on the weekends.  Ms. Daugherty had not authored the "Cheat Sheet" but had been directed by Diane Bernet, then an AHA Billing Manager, to use it.  Since AHA only had one office in Florida at the time (which also served as its corporate headquarters) which handled billing for AHA's original eight locations, it is clear that AHA intended for the Cheat Sheet to be used for all of Defendants' billing.[8]

      77.     Defendants consistently used the same diagnosis codes regardless of the patient's true diagnosis so that they could receive Medicare reimbursements even on those claims that lacked the information required for Medicare reimbursement.

---

[8] American Health Associates acquired the Ohio-based MedLab in October 2014 (*see* ¶ 6, *supra*) and, although MedLab had an established billing department, billing for the combined American Health Associates-Medlab laboratory locations became a massive undertaking.  To deal with this, American Health Associates' Florida headquarters added billing software to help the former MedLab's Ohio operations.  This enabled American Health Associates' Florida-based billing staff to handle the billing/coding for a portion of the work that came from the Ohio-based laboratory locations in the same manner as all other claims—*i.e.* by using the "Cheat Sheet."

79.   The "Cheat Sheet" read as follows:

## LIST OF COMMON TESTS W/DX: [9]

|  | ICD9 |
|---|---|
| BMP/ CMP | 401.9 |
| LIPID PANEL | 272.4 |
| RENAL PANEL | 794.4 |
| HEPATIC PANEL | V58.69 |
| RHEUMATOID FACTOR (RF) | 714.0 |
| PHENYTOIN (DILANTIN) | 780.39 |
| ESTRADIOL | 256.0 |
| TESTOSTERONE | 259.9 |
| PSA | V76.44 OR 185 |
| CRP(C-reactive protein) | 790.95 |
| HEMOGLOBIN AIC | 250.00 |
| PT/INR | 427.31 OR V58.61 |
| OCCULT BLOOD | 285.9 |
| BLOOD CULTURE | 780.60 |
| STOOL CULTURE | 787.91 |
| URINE CULTURE | 599.0 |
| BNP-(Brain natriuretic peptide) | 428.0 |
| C DIFF (Clostridium difficile) | 787.91 |
| INFLUENZA A/B | 786.2 |
| B12/ FOLATE | 281.1 |

---

[9] "DX" stands for "diagnosis" in this table.

|  | ICD9 |
|---|---|
| HOMOCYSTEINE | 277.6 |
| VIT-D | 268.9 |
| INTACT-PTH | 252.9 |

|  | ICD9 |
|---|---|
| HEPATITIS A |  |
| HCV | 573.3 |
| HEPATITIS B SURFACE ANTIGEN (HBsAg) |  |
| HEPATITIS B CORE |  |

**FREE T4:**

|  |  |
|---|---|
| T-UPTAKE |  |
| TT4 | 244.9 |
| T3 |  |
| TSH |  |

**DRUGS**:

|  | ICD9 |
|---|---|
| AMPHETAMINES |  |
| BARBITURATES |  |
| BENZODIAZEPINES |  |
| CANNABNOIDS |  |
| COCAINE |  |
| ETHANOL |  |

KEPPRA                                            V58.69

HEPATIC PANEL

AMIKACIN

CARBAMAZEPINE

GENTAMICIN

LITHIUM

TOBRAMYCIN

80.     An example of how Defendants used the "Cheat Sheet" was in the case of patients receiving urine cultures where there was no diagnosis for the patient listed in QSS. In such a case, when Defendants would submit claims to Medicare for urine cultures, Defendants directed its staff to follow the "Cheat Sheet" and insert the same diagnosis code for each patient receiving urine culture. Thus, Defendants ordered its billers to use a "standard" code for all urine culture claims submitted to Medicare that were missing patient diagnoses—typically diagnosis code 599.0 (urinary tract infection) —regardless of whether this was an accurate patient diagnosis.[10]

81.     Defendants employed a simplified version of the "Cheat Sheet" with respect to Medicaid claims that had missing diagnoses. In cases where laboratory services submitted to Medicaid lacked diagnosis codes, Defendants instructed all billers to plug in generic code V72.60 (laboratory examination) regardless of whether this was the correct diagnosis code.

---

[10] Defendants submitted other fraudulent claims to Medicare for urine cultures as well. Approximately 50% of the urine cultures nurses collected at nursing homes were done in a non-sterile manner such that they were contaminated and should have been re-collected. What happened instead was that the cultures were accessioned into the lab (and given an ID Number), delivered to the Microbiology Department, and then the QSS software would submit the claim for the test to Medicare at the beginning of the intake process, regardless of whether any lab results were obtained. This happened because QSS had no built-in mechanism to allow for auto-crediting when any laboratory test was contaminated or otherwise did not produce a final result. Thus, Defendants billed Medicare for contaminated urine samples that it either had not tested at all or tested without any usable results due to their contamination.

Approximately 20% of the claims submitted using this "Cheat Sheet"-style methodology were Medicaid claims.

82.     To promote adherence to the "Cheat Sheet" and to avoid questioning, Defendants hired billing staff who were unqualified, untrained in medical billing, and held no relevant educational degrees. Almost all of Defendants' billers had received only training from AHA itself, which did not cover proper Medicare procedures for Modifier 91 billing and retrieving missing patient data and were thus unaware that Defendants' coding methods and "Cheat Sheet" use were improper.

C.          **AHA Paid Kickbacks to Physicians for Sending It Medicare Business**

83.     AHA conducts approximately 20 percent of its business with physician groups. AHA provided kickbacks to approximately one-half of these physicians because they generated a large amount of Medicare billing claims for AHA.  Under this kickback scheme, in exchange for these physicians sending AHA a certain amount of Medicare patients who needed the type of tests AHA performed, AHA agreed to only bill these physicians for tests submitted to Medicare for reimbursement and often did not bill, or seek to collect on bills, for these physicians' private-pay patients.

84.     In some instances, the physicians who are part of the kickback scheme have owed AHA as much as $100,000 but AHA has promised them that it will never collect this money. Despite AHA's kickback arrangement, Relator Camille Aguilar nevertheless called all physician office managers on the "accounts receivable" list at AHA who were high-volume AHA clients to attempt collections on a monthly basis.  Jim Jackson, AHA' CFO, consistently reprimanded Relator Aguilar for several years for attempting to collect from those physicians, stating that those physicians maintained a large volume of Medicare patients and thus, should not be disturbed.

85.     The physicians and physician groups for which AHA agreed to waive private

insurance laboratory charges in exchange for Medicare business included:

**Physician Offices:**

Dr. Akselrud
7421 N University Dr. # 309
Tamarac, FL

Dr. Bernstein
21110 Biscayne Blvd #405
Aventura, FL

Dr. Capone
14440 Military Trail
Delray Bch, FL

Dr. Celestin
4608 Forest Hill Blvd
West Palm Bch, FL

Dr. Chertman
1321 NW 14 Street, Ste 304
Miami, FL

Dr. Harrison
1325 Lenox Ave.
Miami Bch, FL

Dr. Lam
600 N Hiatus Rd
Pembroke Pines, FL

Dr. Levin
4302 Alton Rd #1010
Miami Bch, FL

Dr. Levy
2300 N Comm Pwky #111
Weston, FL

Dr. Levy
2100 E Hallandale Bch Blvd
Hallandael Bch, FL

Dr. Lieberman
2100 E Hall #307
Dania, FL

Dr. Meeroff
4640 N Federal Hwy Ste C
Ft. Lauderdale, FL

Dr. Mora
1840 West 49 Street Ste 516
Hialeah, FL

Dr. Oyarzun
4890 West 2 Land
Hialeah, FL

Dr. Pianko
20305 Biscayne Blvd.
Aventura, FL

Dr. Previte
1820 E Commercial Blvd
Ft Lauderdale, FL

Dr. Rand
4480 Sheridan Street
Hollywood, FL

Dr. Ross
252 Flamingo Rd
Pembroke Pine, FL

Dr. Shechter
3001 NW 49 Ave #203
Lauderhill, FL

Dr. Schneider
4302 Alton Rd #570
Miami Bch, FL

Dr. Schotz
4302 Alton Rd. Ste 2020
Miami Bch, FL

Dr. Schwartz
7431 N University Dr. Ste 206
Tamarac, FL

Dr. Suarez
[address unknown]

Dr. Tromans
3175 S Congress Ave 103
Boynton Bch, FL

Dr. Victores
6450 West 21 Ct
Hialeah, FL

Dr. Wand
2232 N University Dr.
Coral Springs, FL

Dr. Weissman
400 Arthur Godfrey Rd Ste 203
Miami Bch, FL

**Physician Practice Groups:**

**San Antonio:**

Dr. Fonseca
14750 SW 26 Street Ste 212
Miami, FL

**Prime Care Family Centers:**

4141 SW 6 Street
Coral Gables, FL

11865 Coral Way Ste C204
Calusa, FL

2140 West 68 Street Ste 518
Hialeah, FL

5590 West 20 Ave.
Hialeah, FL

**Family Practice:**

Dr. Hernandez
University Dr. Davie, FL

86.     Although AHA never intended to collect the monies owed by these physicians'
private-pay patients, it nevertheless continued to list these monies as accounts receivable to assist
it in securing bank financing.

**D.      Defendants' Fraud was Corporately-Directed and Occurred in Multiple
AHA Regions**

87.     AHA's corporate personnel directed the fraud alleged above at multiple AHA
regions during the relevant time period.

88.     AHA directed these fraudulent schemes knowing that its conduct violated
coverage and payment requirements which were material to the United States.

89.     Defendant employed uniform procedures at all of their laboratory locations.[11]
These uniform practices evidenced how AHA went about setting up new lab locations.  When

---

[11] After the October 2014 Medlab acquisition, AHA's laboratory facilities were divided into East
and West Regions.  The East Region covered AHA's laboratory facilities in: (1) Davie, FL; (2)

AHA opened a new laboratory location, AHA's owner Debbie Martin would send in a team of AHA employees from its Davie, Florida headquarters (the "Florida Team") to set up the various staff members and departments.

90.     All of the training AHA did at its locations was done verbally and was carried out by AHA's team leadership, which consisted of:

- Debbie Martin (CEO)

- Christopher Martin (President)

- Diana Bernet (Billing Director for all AHA regions, who trained the new billers to work in a uniform manner to maximize reimbursement for AHA but never trained her employees regarding proper Medicare billing)

- Jim Jackson (CFO and General Manager)

- Shane McDonald (IT Director)

91.     Among other things, the Florida Team would ensure that the new laboratory location would follow AHA's uniform practices for obtaining, entering, and accessioning specimens into its QSS computer system.  AHA CFO and General Manager Jim Jackson designed the Accessioning/Specimen entry system so that the same document control and numbering processes were implemented for billing and tracking purposes at all AHA laboratory locations.

---

Tampa, FL; (3) Nashville, TN; (4) Spartanburg, SC; (5) Columbia MD; (6) Atlanta, GA; (7) and Detroit, MI.  The West Region covered AHA's laboratory facilities in: (1) Cleveland, OH; (2) Cincinnati, OH; (3) Akron, OH; (4) St. Louis, MO; and (5) Lexington KY.  AHA also served clients in states that did not have a clinical lab facility as AHA would fly clinical specimens all over the U.S. daily to the closest AHA laboratory facility that could accommodate the testing. For example, Delaware would courier specimens to AHA's Maryland lab, Texas would fly specimens to AHA's Davie, Florida lab, and North Carolina would courier specimens to AHA's South Carolina lab.

92.     AHA's Accession/Specimen entry system procedures enabled Defendants to double-bill Medicare with impunity by fraudulently adding Modifier 91 to lab cultures. For example, as previously discussed, each blood culture is comprised of two vials but should receive a single specimen accession number and be billed as one test. By contrast, AHA issued a unique number (specimen accession number) to each individual blood culture vial so that AHA staff would append the Modifier 91 to every second vial and double or triple Defendants' Medicare reimbursement.

93.     AHA also held quarterly billing staff meetings for all billing staff from AHA's East and West regions. Billing staff received meeting notifications and meeting agenda items via email and were required to participate in these meetings at least by phone. The meetings covered various billing-related topics, including reviewing directives for AHA billing practices such as the required use of Modifier 91.

94.     AHA Billing Department Director Diana Bernet ran these quarterly meetings which emphasized owner Debbie Martin's desire to have all branches adhere to uniform billing practices. Ms. Martin would always attend these quarterly billing meetings—either in person or remotely via "go to meeting" software. During these quarterly billing meetings, Ms. Martin gave constant verbal directives to billing personnel such as: "you people need to sit there and do whatever it takes to get the money in this door. If not, I will lay you off" and "I don't care what you do, just do whatever is necessary to get the money in." Ms. Martin also gave the billing staff instructions not to call physicians to obtain the correct diagnosis codes to submit with laboratory claims because this would take too much time.

## COUNT I

### False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (West 2012)
### Submission of False Claims

95.     Relators incorporate by reference all paragraphs of this complaint as if fully set forth herein.

96.     Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, acting through the Medicare and Medicaid programs, for reimbursement of: (1) laboratory tests not eligible for Medicare reimbursement and (2) laboratory tests that were provided as a result of the payment of kickbacks to AHA.

97.     By virtue of the false or fraudulent claims presented or caused to be presented by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.  For violations occurring after November 2, 2015, the civil penalty for each claim is not less than $10,957 and not more than $21,916.  28 C.F.R. § 85.3(a)(9).

## COUNT II
### False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (West 2012)
### Use of False Records of Statements

98.     Relators incorporate by reference all paragraphs of this complaint as if fully set forth herein.

99.     Defendants knowingly made, used, and caused to be made or used, false records or statements — *i.e.,* false certifications and representations made and caused to be made by the AHA — to get false or fraudulent claims paid and approved by the United States for reimbursement of: (1) laboratory tests not eligible for Medicare reimbursement and (2) laboratory tests that were provided as a result of the payment of kickbacks to AHA.

100.    By virtue of the false or fraudulent claims presented or caused to be presented by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.  For violations occurring after November 2, 2015, the civil penalty for each claim is not less than $10,957 and not more than $21,916.  28 C.F.R. § 85.3(a)(9).

## COUNT III
### Florida False Claims Act, Fla. Stat. Ann. § 68.082(2)(a)
### Submission of False Claims

101.    Relators incorporate by reference all paragraphs of this complaint as if fully set forth herein.

102.    This is a claim for treble damages and civil penalties under the Florida FCA, Fla. Stat. Ann. § 68.083(2).

103.    As alleged herein, Defendants violated Fla. Stat. Ann. § 68.082(2)(a) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval to the State of Florida, acting through the Medicaid program, for reimbursement of: (1) laboratory tests not eligible for Medicaid reimbursement and (2) laboratory tests that were provided as a result of the payment of kickbacks to AHA.

104.    By reason of these payments, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## COUNT IV
### Florida False Claims Act, Fla. Stat. Ann. § 68.082(2)(b)
### Use of False Records or Statements

105.    Relators incorporate by reference all paragraphs of this complaint as if fully set forth herein.

106.    This is a claim for treble damages and civil penalties under the Florida FCA, Fla. Stat. Ann. § 68.083(2).

107.    As alleged herein, Defendants violated Fla. Stat. Ann. § 68.082(2)(b) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim paid or approved by the State of Florida, acting through the Medicaid program, for reimbursement of: (1) laboratory tests not eligible for Medicaid reimbursement and (2) laboratory tests that were provided as a result of the payment of kickbacks to AHA.

108.    As described above, Defendants' acts violated one or more Florida statutes § 456.054 (prohibiting kickbacks), § 409.920(2)(a)(5) (prohibiting Medicaid provider kickbacks) and § 395.0185 (prohibiting rebates).

109.    By reason of these payments, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Relators Roberta Van Donge and Camille Aguilar request that judgment be entered against Defendants, ordering that:

A.    Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* and the Florida FCA, Fla. Stat. Ann. § 68.081, *et. seq.*;

B.    Defendants pay the United States not less than $5,500 and not more than $11,000 (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990) for each violation of 31 U.S.C. § 3729 occurring before November 2, 2015, plus three times the amount of damages the United States has sustained because of AHA's misconduct;

C.    Defendants pay the United States not less than $10,957 and not more than $21,916 for each violation of 31 U.S.C. § 3729 occurring on or after November 2, 2015, plus

three times the amount of damages the United States has sustained because of AHA's misconduct;

D.      Defendants pay the State of Florida not less than $5,500, and not more than the greater of $11,000 for each violation of Fla. Stat. Ann. § 68.082, plus three times the amount of Medicaid payments paid by the State of Florida because of AHA's misconduct;

E.      Relators be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d) and Fla. Stat. Ann. § 68.085;

F.      Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), Fla. Stat. Ann. § 68.085(1)(c) or (2), and any other applicable law or regulation;

G.      Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

H.      The United States, the State of Florida, and Relators be awarded such other, further or different relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a

trial by jury.

DATED:   September 25, 2018          Respectfully submitted,


By: _____

Jonathan Kroner, FBN 328677
**JONATHAN KRONER LAW OFFICE**
300 S. Biscayne Blvd., Suite 3710
Miami, Florida 33131
Telephone: (305) 310-6046
jk@FloridaFalseClaim.com

*Local Counsel for Roberta Van Donge and
Camille Aguilar*

Anna C. Dover
**MILBERG TADLER PHILLIPS
GROSSMAN LLP**
One Pennsylvania Plaza, Suite 1920
New York, New York  10119-0165
Telephone: (212) 594-5300
adover@milberg.com

*Primary Counsel for Roberta Van Donge and
Camille Aguilar*